THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **KIMBERLY ROQUEMORE,**<br>**Individually and as the Administratrix**<br>**of the Estate of Maalik Roquemore,**<br>**Deceased**<br>c/o David Malik, Esq.<br>31320 Solon Road, Unit 19<br>Solon, Ohio 44139<br><br>    Plaintiff,<br><br>   -vs-<br><br>**CUYAHOGA METROPOLITAN**<br>**HOUSING AUTHORITY**<br>8120 Kinsman Road<br>Cleveland, OH 44104<br><br>and<br><br>**CUYAHOGA METROPOLITAN**<br>**HOUSING AUTHORITY POLICE**<br>**DEPARTMENT**<br>5715 Woodland Avenue<br>Cleveland, Ohio 44104<br><br>and<br><br>**ANDRÉS GONZÁLEZ, CHIEF,**<br>**CUYAHOGA METROPOLITAN**<br>**HOUSING AUTHORITY POLICE**<br>**DEPARTMENT, Individually and in his**<br>**Official Capacity as Chief of Cuyahoga**<br>**Metropolitan Housing Authority Police**<br>**Department**<br>5715 Woodland Avenue<br>Cleveland, Ohio 4410<br><br>and<br><br>**VICTOR MCDOWELL, DEPUTY**<br>**CHIEF OF POLICE, CUYAHOGA**<br>**METROPOLITAN HOUSING**<br>**AUTHORITY POLICE**<br>**DEPARTMENT, Individually and in his** | **CASE NO. 1:24-cv-01434**<br><br>**JUDGE DONALD C. NUGENT**<br><br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY DEMAND ENDORSED**<br>**HEREON** |

**Official Capacity as an Employee of the** )
**Cuyahoga Metropolitan Housing** )
**Authority Police Department** )
5715 Woodland Avenue )
Cleveland, Ohio 44104 )
)
and )
)
**DESMOND RAGLAND** )
**C/O CUYAHOGA METROPOLITAN** )
**HOUSING AUTHORITY POLICE** )
**DEPARTMENT, Individually and in his** )
**Official Capacity as an Employee of the** )
**Cuyahoga Metropolitan Housing** )
**Authority Police Department** )
5715 Woodland Avenue )
Cleveland, Ohio 44104 )
)
and )
)
**THOMAS BURDYSHAW,** )
**COMMANDER OF FIELD** )
**OPERATIONS, CUYAHOGA** )
**METROPOLITAN HOUSING** )
**AUTHORITY POLICE** )
**DEPARTMENT, Individually and in his** )
**Official Capacity as an Employee of the** )
**Cuyahoga Metropolitan Housing** )
**Authority Police Department** )
5715 Woodland Avenue )
Cleveland, Ohio 44104 )
)
and )
)
**JOHN SMIDDY, FIELD TRAINING** )
**OFFICER PROGRAM SUPERVISOR,** )
**CUYAHOGA METROPOLITAN** )
**HOUSING AUTHORITY POLICE** )
**DEPARTMENT, Individually and in his** )
**Official Capacity as an Employee of the** )
**Cuyahoga Metropolitan Housing** )
**Authority Police Department** )
5715 Woodland Avenue )
Cleveland, Ohio 44104 )
)
and )
)
**JEFFERY PATTERSON, CHIEF** )

2

**EXECUTIVE OFFICER AND SAFETY**  )
**DIRECTOR, CUYAHOGA**  )
**METROPOLITAN HOUSING**  )
**AUTHORITY, Individually and in his**  )
**Official Capacity as an Employee of the**  )
**Cuyahoga Metropolitan Housing**  )
**Authority**  )
8120 Kinsman Road  )
Cleveland, Ohio 44104  )
 )
and  )
 )
**JOHN DOES (I-X)**  )
("Names Unknown")  )
[Persons whose actual names are unknown  )
and whose names and addresses Plaintiffs  )
could not discover]  )
 )
       Defendants.  )

## INTRODUCTION

1.     This case challenges the September 5, 2022, violation of Maalik Roquemore's ("*Maalik*") civil rights under 42 U.S.C. § 1983 and the violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 by the Cuyahoga Metropolitan Housing Authority ("*CHMA*"), Cuyahoga Metropolitan Housing Authority Police ("*CMHA PD*"), Officer Desmond Ragland ("*Officer Ragland*"), and the remaining Defendants.[1]

2.     Officer Ragland unreasonably shot the *unarmed* Maalik twice, killing him. At the time of his death, Maalik was a thirty-two (32) year old resident of CMHA and a nursing student at Cleveland State University.

3.     Maalik also suffered from medically documented schizophrenia and Post-Traumatic Stress Disorder ("*PTSD*"), which led him to experience an overt, acute mental health crisis resulting in publicly displayed abnormal behavior On September 5, 2022, shortly after

---

[1] There is a body cam video. Segments of the shooting video are on the internet. Plaintiff has not yet had the opportunity to authenticate all these video segments or determine their accuracy.

3

midnight. Officer Ragland's response to Maalik's abnormal and atypical behavior and mental health crisis was to use deadly force.

4.    This case additionally challenges the inadequate policymaking, training, monitoring and supervision of Officer Ragland, a relatively newly hired/probationary CMHA PD employee. Officer Ragland was inadequately trained due to inadequate CMHA and CMHA PD procedures, policies and customs which were each deliberately indifferent to CMHA residents and a moving force behind the deprivation of Maalik's clearly established constitutional rights.

5.    At the time of Maalik's death, the inadequately trained Officer Ragland was, operating alone on CMHA properties. Inadequate Officer Field Training, CMHA and CMHA PD customs, practices, policies, and procedures and/or lack thereof, caused the premature placement of Officer Ragland, into the one-man CMHA PD patrol car, without an adequately trained Field Training Officer and/or supervising officer.

6.    CMHA PD deliberately took a training program shortcut and partially "field trained" Officer Ragland for only fifteen (15) weeks out of the CMHA PD mandatory twenty-four (24) weeks! Both CMHA and CMHA PD condoned the training shortcut and each encouraged Officer Ragland to work on the streets of CMHA properties, alone, unmonitored and unsupervised by an FTO and/or other police officers. No Defendant took any action to change or correct this fatal assignment of Officer Ragland to the streets of CMHA properties. Had a fully trained, supervised and more experienced officer been present to guide Officer Ragland, the encounter would have certainly unfolded in a safer manner without unreasonable force being used and a fatal outcome would have been avoided.

7.    The inadequate training of Officer Ragland includes but is not limited to, a failure to adequately train him in crisis intervention techniques, communication techniques, adequate de-

escalation techniques, adequate scene diagnosis, management of a person demonstrating exaggerated gestures and abnormal behavior, and in the use of effective less than lethal tactics.

8.      On September 5, 2022, the inadequately trained Officer Ragland acted deliberately indifferent to Maalik's constitutional and other legal rights, by failing to correctly de-escalate with less than lethal force upon encountering Maalik who was in a mental health crisis. Officer Ragland failed to adequately use effective less than lethal force, due to his inadequate training. Officer Ragland's deliberate indifference led him to use unreasonable lethal force. Officer Ragland was so inadequately trained, that when he attempted to use his Taser, he shot himself in the left index finger with his own Taser barb.

9.      When deploying his Taser, the inadequately trained Officer Ragland tased himself with one Taser barb, causing a self-inflicted wound to his left index finger. Maalik was struck by the second barb containing an electrical charge. Maalik did not receive the full effect of being struck by two barbs and therefore continued his abnormal behavior.

10.      As Maalik retreated away from Officer Ragland upon being tased in the left chest, Officer Ragland dropped his Taser to the ground. Maalik then continued to move and retreat around the police car. Maalik retreated into a grassy area of the housing complex, away from Officer Ragland.

11.      The unarmed Maalik then again began to approach Officer Ragland. This time, Officer Ragland pulled his semi-automatic 9 mm CMHA PD issued handgun, deliberately disregarding other less than lethal de-escalation techniques, such as briefly using the "stun mode" of the Taser, his ASP baton, pepper spray, or non-lethal hand to hand techniques.  Officer Ragland failed to call for backup at this moment in time, or retreat and safely wait in his police car which were all available to him at that moment in time. Officer Ragland fell far short of what little training

5

he did have by not using practices designed to minimize the use of deadly force when encountering an unarmed person.

12.     Officer Ragland thus acted with deliberate indifference as he unreasonably, and unnecessarily seized Maalik by attempting to Tase him and then gratuitously and unreasonably shooting the unarmed Maalik twice, causing him to ultimately pass away at Fairview Hospital that same day.

13.     In this case, prior to and thereafter the fatal outcome, Defendants condoned, encouraged and knowingly acquiesced with CMHA, CMHA PD and their respective policymaker's policies, customs, and practices, procedures and decision to condoned Officer Ragland's operational behavior, incomplete Field Training from a qualified Field Training Officer ("*FTO*"), incomplete Crisis Intervention Team Training ("*CITT*") and other training which is recognized in community policing as necessary knowledge to develop necessary skills for officers when encountering CMHA residents in a mental crisis.

14.     CMHA, CMHA PD and their respective policymakers named herein condoned, ratified and acquiesced to permit the incomplete training of Officer Ragland. The policymakers identified in this case were on actual or constructive notice that the omission of a complete field training program and CITT for officers and Officer Ragland would violate citizens' civil rights such as those constitutional rights of CMHA resident, Maalik Roquemore.

## JURISDICTION AND VENUE

15.     This claim is brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983.

16.     Jurisdiction of claims arising from Defendants' violations of the Civil Rights Act is conferred upon this Court by 28 U.S.C. § 1331, 1343(3)-(4).

17.     Jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367.

6

18.     Venue is proper in this division.

**PARTIES**

19.     By entry of the Probate Court of Cuyahoga County, dated June 15, 2023, Kimberly Roquemore ("*Ms. Roquemore")* is the duly appointed and authorized as the Administratrix of the Estate of Maalik Roquemore. A true and accurate copy of this entry is attached hereto as Exhibit "A."

20.     Maalik died on September 5, 2022, at age 32, in Cuyahoga County, Ohio and is survived by his mother, Ms. Roquemore, who, as a result of the decedent's death, has sustained emotion and pecuniary injury.

21.     Officer Ragland was, relevant to this action, a law enforcement officer employed by the CMHA PD. Officer Ragland is a "person" under 42 U.S.C. § 1983 and always acted under color of law relevant to this case. He is sued individually and in his official capacity as an employee of CMHA PD. Officer Ragland was personally involved in the deprivation of Maalik's federal rights.

22.     CMHA PD Chief Andrés González ("*Chief González*") was, relevant to this action, a final policy maker of the CMHA PD. Chief González was personally involved, condoned, and approved the final policy content of CMHA PD policies, practices, customs and procedures.  Chief González is a "person" under 42 U.S.C. § 1983 and acted under color of law.

23.     As Chief of Police, he is responsible for directing, approving, and administering police and safety staff and overseeing CMHA community safety activities. (Policy and Procedure Manual Chapter 1.1). Chief González' duties extend to operating consistently with CMHA's "Strategic Plan" of safety in effect in 2022.

24.     Chief González is being sued in his individual and official capacity as an employee

7

of CMHA PD. Chief González was personally involved in the deprivation of Maalik's federal rights by his approval of the decision to shorten and withdraw a Field Training Officer from Officer Ragland's' field training.

25. CMHA is a state actor as well as a federally and Cuyahoga County funded organization. CMHA's mission according to its written and publicly published "*Strategic Plan*" is to provide safe housing and safe police services to its residents. As community partners, CMHA and CMHA PD are jointly and equally accountable for developing, implementing and approving police crisis intervention training policy and policymaking. Inadequate policies of CMHA and CMHA PD overlap in this context. CMHA is a "person" under 42 U.S.C. § 1983. CMHA acts under the color of law.

26. A CMHA Administrative Order, approved by Resolution of the CMHA Board of Commissioners, established the CMHA Department of Police and Security. CMHA is a public entity within the meaning of the Americans with Disabilities Act *(ADA)*, 42 U.S.C. § 12131. CMHA is essentially a political subdivision.

27. CMHA is a final policymaker. CMHA and CMHA PD have, however, each developed inadequate policies, customs, practices, and procedures that are not consistent with CMHA's 2018-2023 *Strategic Plan*. As such, CMHA and CMHA PD have failed to make "reasonable accommodations" for mentally ill residents in a crisis such as Maalik, by failing to employ adequate number of CITT police officers to meet the needs of CMHA residents who experienced a mental crisis, such as Maalik. Educating police officers in adequate crisis intervention would not have placed CMHA or CMHA PD under "undue financial and administrative burden".

28. The training for CMHA personnel and CMHA PD officers is free through the

8

A.D.A.M.H.S. Board of Cuyahoga County.  CMHA and CMHA PD had personal, actual and/or constructive notice of CMHA PD Officer Field Training Program staffing and training deficiencies in its police department as evidenced by a CMHA July 8, 2022, evaluation of Officer Ragland which reflects no 40-hour CITT was provided to Officer Ragland as his FTO was removed by CMHA PD from his field training.  CMHA and CMHA PD also condoned and acquiesced in their custom and policy of not only failing to completely train officers but, failed in maintaining an adequate number of CITT officers and CITT programing for officers.

29.   CMHA PD is a state certified police force. It operates with the approval of and under the laws of the State of Ohio, federal law, codified ordinance, and statutes.  CMHA PD are "persons" under 42 U.S.C. § 1983, and at all times relevant to this case acted under color of law.

30.   CMHA PD is a public entity within the meaning of the Americans with Disabilities Act, 42 U.S.C. §12131. CMHA PD is a final policymaker of CMHA police policies and procedures.

31.   The CMHA PD and its agents condoned and approved the reduction of FTO participation to the detriment of CMHA residents. CMHA PD is a final policymaker as is evidenced by a CMHA PD July 8, 2022, memo, regarding Officer Ragland which demonstrates a policy, custom and practice of failing to completely train officers.

32.   Victor McDowell ("*Deputy Chief McDowell*") is the Deputy Chief of CMHA PD. McDowell is a "person" under 42 U.S.C. § 1983.  Deputy Chief McDowell was at all times herein acting under "color of law."

33.   Deputy Chief McDowell is a final policymaker for CMHA PD policies, customs, practices and procedures. This is reflected in the July 8, 2022, Field Commander memorandum of Officer Ragland (#57). Deputy Chief McDowell was personally involved in the creation and

approval of the final policy content of CMHA PD training, policies, and procedures.

34.     Deputy Chief McDowell is a final policymaker of CMHA PD policies and procedures, and he condoned and approved reduction of the Field Training Officer program. Deputy Chief McDowell was personally involved in the deprivation of Maalik's federal rights as is evidenced by a CMHA PD evaluation of Officer Ragland.

35.     Thomas M. Burdyshaw ("*Police Commander Burdyshaw*") is a CMHA PD Commander.  He is a "person" under 42 U.S.C. § 1983.  Police Commander Burdyshaw was at all times herein acting under "color of law."

36.     Police Commander Burdyshaw was a final policymaker personally involved in the creation and approval of the final policy content of CMHA PD training, policies, and procedures.

37.     Police Commander Burdyshaw is a final policymaker of CMHA PD policies and procedures, and he condoned and approved reduction of the Field Training Officer program. Police Commander Burdyshaw was personally involved in the deprivation of Maalik's federal rights as is evidenced by the July 8, 2022, evaluation of Officer Ragland.

38.     John Smiddy ("*Police FTO Smiddy*") is the CMHA PD Field Training Officer and Program Supervisor. Police Field Training Officer Smiddy is a "person" under 42 U.S.C. § 1983. Smiddy was at all times herein acting under "color of law."

39.      Police FTO Smiddy was a final policymaker personally involved in the creation and approval of the final policy content of CMHA PD training, policies, and procedures.

40.     Police FTO Smiddy is a final policymaker of CMHA PD policies and procedures, and he condoned and approved reduction of the FTO program. Police FTO Smiddy was personally involved in the deprivation of Maalik's federal rights as is evidenced by the July 8, 2022, evaluation of Officer Ragland.

41.    Jeffery Patterson ("*CEO Patterson*") is the Chief Executive Officer and Safety Director for CMHA.  CEO Patterson is a "person" under 42 U.S.C. § 1983 and was at all times herein acting under "color of law."

42.    CEO Patterson was a final policymaker personally involved in the creation and approval of the final policies, customs, practices, procedures and content of CMHA and CMHA PD matters related to CMHA's "*Strategic Plan*", CMHA safety planning and oversight of the CMHA PD training.

43.    CEO Patterson condoned and/or through inaction personally and officially, constructively and/or directly ratified the deficiencies of the CMHA PD Field Training Officer program which were a cause of the death of Maalik.  CEO Patterson was personally involved in the deprivation of Maalik's federal rights.

44.    John Does (I-X), are unknown individuals, business entities, or organizations who violated Maalik's constitutional rights.   The identities of these individuals or entities are not known to the Plaintiff who consequently sue these Defendants by their fictitious names. Plaintiff will seek leave to amend this Complaint to state the true names and capacities of these fictitiously named Defendants when they have been ascertained.

## FACTS

### BRIEF HISTORY OF MAALIK ROQUEMORE AND FAMILY

45.    Plaintiff adopts and incorporates herein by reference all claims, counts, allegations and averments contained in this Complaint, whether stated before or after this claim or count, as if same were fully rewritten herein.

46.    Maalik was born on January 21, 1990. He was a 32-year-old Black male pursuing a Bachelor of Science in Nursing from Cleveland State University ("*CSU*"). Maalik's career goal

11

was to become a Registered Nurse specializing in Behavioral Health to help others living with mental health matters to achieve their highest quality of life.  Maalik received behavioral medicine services at Recovery Resources in Cuyahoga County for approximately thirteen years. Maalik often served as a Group Leader in this milieu. Maalik resided at The Villages of Riverside; a property managed by CMHA. His address at the time of his death was 4624 West 174th Street in Cleveland, Ohio.

47.    Maalik was a soft-spoken, courteous, well-mannered man loved by his family, his Riverside neighbors, and fellow CSU students and professors. Maalik was single. He had no children. He lived independently at CMHA without incident as a resident.

48.    Maalik was a qualified individual with a disability under the Americans with Disabilities Act, 42 U.S.C. § 12131.

49.    Maalik's mother, Kimberly, was her son's sole support system throughout his childhood and adulthood.

50.    Maalik's father lived in Cleveland, Ohio, was not active in Maalik's life, and he had essentially abandoned Maalik. Maalik's maternal Aunt, who also lived in Cleveland, Ohio, helped Maalik when she could.

51.    Maalik was a medically documented disabled resident of CMHA since approximately 2010-2011. During his residency at CMHA, Maalik lived at three (3) different CMHA properties. Maalik lived in two different high-rise buildings with older adults until 2015. In 2015, CMHA transferred Maalik to a one-bedroom townhouse at The Villages of Riverside ("*Riverside*"), specifically on Parkmount Avenue, Cleveland, Ohio.  This was an all age, family community.

52.     In 2019, Riverside completed renovations. Maalik was then transitioned from the

12

one-bedroom unit into a two-bedroom townhouse unit at Riverside, specifically at 4624 West 174th Street Cleveland, Ohio. Maalik was placed in a 2-bedroom unit, as single occupant, which was on the main road of Riverside on 174th Street, a high-traffic street with more noise and distractions.

53. At all times relevant herein, CMHA was aware and on notice of Malik's mental health challenges which included schizophrenia and PTSD. This information was provided to CMHA by Ms. Roquemore at CMHA's request during the resident housing qualification process.

54. Ms. Roquemore made it a point to provide CMHA with relevant records documenting Maalik's mental health challenges. It is unknown at this time, what if any, mental health information was shared about Maalik internally, within the CMHA organization and the CMHA police department.

55. In 2009 Maalik graduated from high school and he was a productive member of society. In 2014 Maalik graduated from Cuyahoga Community College's CNC Machinist Program. Maalik then worked as a CNC Machinist Level 1 operator making intricate, commercial airplane parts in Cleveland, Ohio. In 2018, Maalik also graduated from barber school in Cleveland, Ohio.

56. As noted, Maalik's ultimate career goal was to become a Registered Nurse (RN) specializing in behavioral health. Maalik's goal was to help others living with mental illness and mental health issues.

57. At the time of his death, Maalik had already been recognized for his high academic achievements by the CSU National Society of Leadership and Success (NSLS) with cumulative GPAs of 3.85-3.96. In a 2023 induction ceremony, Maalik's mother received the honor on behalf of Maalik and his family.

**MAALIK'S MENTAL HEALTH CRISIS ON SEPTEMBER 5, 2022**

58. In the early hours of September 5, 2022, Maalik was experiencing a mental health

crisis at the CMHA housing complex in which he resided. Maalik's mental health conditions had been recognized by the Social Security Administration as a disability.

59.     At about 12:37 am, Officer Ragland responded to a radio dispatch complaint of loud noise at the same apartment complex.

60.     As Officer Ragland drove into the apartment complex in his CMHA PD car, he stated to himself and/or the person on the other end of his telephone call, "*There's a male over here. Get the fuck out the way!*" To other observers, Maalik was shadowboxing and displaying internally stimulated and exaggerated behaviors. Officer Ragland saw Maalik and his behavior prior to getting out of his police vehicle.

61.     On a personal phone call in the cruiser, a distracted Officer Ragland saw Maalik standing in Maalik's front courtyard near Maalik's front door. Officer Ragland told the party on the personal phone call that he questioned what the male wanted and who the man was that he thought was flagging him down.[2]

62.     Maalik was wearing a white T-shirt, pajama pants, and white tube socks covering both lower legs and not wearing any shoes. Maalik was visibly unarmed.

63.     Maalik was obviously amid a mental health crisis and was acting erratically. A reasonably trained police officer would clearly understand, and it would be reasonably apparent to an officer, that the man before them was suffering from an adverse mental health crisis.

64.     Officer Ragland, seeing Maalik, stopped his patrol car, opened his driver's side door, and faced Maalik. Maalik came up to Officer Ragland and a momentary tussle ensued between Maalik and Officer Ragland. Officer Ragland, who seemed surprised, by Maalik stated,

---

[2] After the incident, Officer Ragland declared that he did not know whether Maalik's attempt to flag down the police car was connected to the loud noise complaint

"*Motherfucker!*"  Maalik used a distressed tone of voice indicating a mental crisis by saying in an exaggerated manner and voice, "*Nope! Nope! Nope*!" repeatedly. Officer Ragland commented at some point after the interaction that Maalik "*was mental*".

65.    With his police car door open on the driver's side, Officer Ragland grabbed his Taser and fired a single Taser cartridge at Maalik, striking Maalik with one Taser prong in the left chest. Officer Ragland, however, also struck himself with the Taser in his left index finger. Officer Ragland then dropped the Taser, abandoning all other forms of non-lethal force despite stating after he killed Maalik that he had recognized and understood that Maalik "*was mental*".

66.    Maalik disengaged from Officer Ragland after this initial encounter.

67.    Officer Ragland did not make any attempt to further de-escalate, disengage, retreat, or call for backup assistance to help him deal with Maalik, who was clearly in the midst of a mental health crisis.

68.    Officer Ragland never remained in or returned to his patrol car to use his microphone to address Maalik through the police vehicles outside speaker.

69.    After the brief initial encounter between Maalik and Officer Ragland, Maalik ran around the police car, beginning at the front of the police car. In response, Officer Ragland drew his service weapon and cut Maalik off as he rounded the police car. Maalik retreated into a grassy area. Despite this retreat, Officer Ragland verbally ordered Maalik to stay away from him multiple times.  During this encounter Officer Ragland, as a direct result of his inadequate training and his premature placement by his superiors on the street stated multiple times "*I'm scared. I'm scared*.".

70.    Officer Ragland then, with deliberate indifference, used unnecessary, unreasonable and excessive force against Maalik. Officer Ragland fired one 9mm round directly into Maalik's torso, striking him in the left hip and severely wounding and disabling Maalik. No serious threat

15

was posed to Officer Ragland or others by Maalik when Office Ragland first fired his handgun.

71.     Despite the fact that Maalik posed no direct or serious threat to the health or safety of Officer Ragland or others, he gratuitously and unreasonably fired another 9mm round striking Maalik a second time in the left, anterior chest area of his torso. This shot additionally and severely diminished the breathing function and capacity of both of Maalik's lungs. Maalik fell to the ground, wailing in agony while trying to stand up, but he collapsed on his left side with agonal breathing.

72.     Officer Ragland proceeded to unnecessarily handcuff Maalik's hands behind his back, then went to his police car to retrieve a first aid kit. Maalik continued to pose no serious threat to the health or safety of Officer Ragland or others at the time of his handcuffing.

73.     Officer Ragland then gratuitously and deliberately added to Maalik's severe pain and suffering by forcing the handcuffed Maalik onto his stomach and then onto his knees while pulling Maalik along the grass to the cement using the handcuffs as a handle.  Officer Ragland was deliberately indifferent to the additional physical and mental pain he was causing Maalik.  Officer Ragland did nothing to prevent positional asphyxia.

74.     Maalik gasped, "*I can't breathe*!"

75.     A bystander pleaded with Officer Ragland for permission to help as Maalik was profusely bleeding from the gunshot wounds to his left anterior chest and left hip. The bystander explained that he was a Certified Nursing Assistant (I), and he could see that Maalik was actively dying. The bystander pleaded with Officer Ragland to remove the handcuffs from Maalik as Maalik continued to pose no real threat.  Officer Ragland refused the bystander's effort to assist with medical aid to Maalik, who was struggling to breathe while bleeding out from gunshot wounds in his chest and hip, all while his hands were cuffed behind his back.

76.     Officer Ragland deliberately failed to render comfort and effective aid to Maalik.

16

Instead, Officer Ragland continued to flash a flashlight on Maalik's face and turned Maalik from a supine to a side-lying position while stating, "*I don't see where I shot him*." Maalik's white T-shirt was soaked with blood.

77.    EMS was notified of the shooting via the county dispatch system after Officer Ragland reported it.  When EMTs arrived to assist Officer Ragland, he stated to the EMTs and others nearby that "*He was mental!"* EMS has indicated that aid was rendered to Maalik at 00:45 hours (12:45 am).  EMS records indicate a Bolin Chest Seal was applied.[3]

78.    When EMS Medic 43 arrived, Officer Ragland removed the handcuffs from Maalik. The medics placed Maalik on a gurney and transported him to Fairview General Hospital.

79.    After thirty (30) minutes of no signs of life during the resuscitative attempt by the ED doctor, James Renuart ("*Dr. Renuart*"), and trauma staff, the resuscitative attempt was stopped. Maalik was pronounced dead by Dr. Renuart at Fairview General Hospital at 1:35 a.m.

80.    Maalik had, prior to this September 5, 2022, incident, been diagnosed with schizophrenia and PTSD by a Cuyahoga County mental health agency. This fact was known to CMHA on September 5, 2022, because Maalik's mother had previously provided written documentation to CMHA in 2010 and thereafter.  CMHA was on notice and knew that Maalik was a resident of the CMHA community in which he lived and that he had been diagnosed with a mental health condition.

81.    Officer Ragland's mandatory six-month Field Training began on March 14, 2022. His Field Training ended prematurely (two months early) on July 8, 2022, due to the deliberately indifferent policies, procedures, customs and practices and ratification by Chief Gonzáles, Deputy Chief McDowell, Police Commander Burdyshaw, Police Field Training Officer Smiddy, CMHA,

---

[3] There is no mention of this seal being applied in the Fairview Emergency Room Records.

CMHA PD and CEO Patterson who constructively and/or affirmatively condoned this institutional behavior.

82.     Had Officer Ragland been adequately and properly trained in CITT and received the required and complete six-month Field Training in which he would have been accompanied by and supervised by a FTO on September 5, 2022, Maalik would not have suffered or be deceased. It was not until months after the September 5, 2022, shooting of Maalik that Officer Ragland completed training related to the non-deadly field management of individuals, including Maalik.

83.     Had Officer Ragland's Field Training not been deliberately interrupted, Officer Ragland would have had a partner, Police Field Training Officer Smiddy and/or other John Doe Field Training Officers partnering officially accompanying him on September 5, 2022. Officer Ragland would have then been coached and guided by an adequately trained Crisis Intervention Trained Officer or Field Training Officer and there would not have been the fatal and tragic outcome that occurred in this case.

84.     Had Officer Ragland been accompanied by a Field Training Officer and/or CITT Officer on September 5, 2022, to monitor and supervise Officer Ragland, there would have been a different interaction among officers and Maalik that did not result in injury or death to Maalik.

85.     There is no record of Officer Ragland being re-evaluated for use of a firearm while on duty, as CMHA PD policy indicated he should have been. Furthermore, Officer Ragland's background at the time of his hiring included CMHA and CMHA PD, knowing he used violence against a past girlfriend, causing indirect injury to her face.

86.     CMHA and CMHA PD deliberately failed to provide Officer Ragland with adequate crisis intervention training before placing him alone (in a one-man zone car) and within a predominantly Black community, which CMHA, CMHA PD and the remaining Defendants

herein knew to have a concentration of citizens with psychological abnormalities and mental health disabilities.

87.    In short, CMHA and CMHA PD deliberately, with indifference, disregarded the fundamentals of community policing and training.  In doing so Defendants created and perpetuated an underserved resident population.

88.    It was foreseeable that CMHA PD officers would, as part of their routine duties, encounter people in a mental crisis as they did with Maalik.

89.    The training and supervision shortcomings of CMHA and CMHA PD are exactly the type of custom and/or policy that violates constitutional protections because they are a moving force underlying constitutional protections and violations.

90.    This continuous and repeated failure to adequately train in crisis intervention and cease field training demonstrates a pattern and practice of CMHA and the CMHA PD.

91.    CMHA and CMHA PD failure to adequately train and supervise officers, and to shorten the field training of officers, constitutes customs or practices that are not written but which are so pervasive and longstanding practices that they have the force of law. Relevant records further reveal that on September 5, 2022, Ragland had not been adequately and additionally trained in various subject matter areas of community policing including but not limited to disability communications, crisis intervention, effective communication, safe interaction with persons in crisis, as well as critical thinking in use of force situations and ADA Title II accommodations.

92.    According to CMHA PD (chapter 3.5) Crisis Intervention policy: "*Members of the department may take a person into temporary custody and deliver him to a medical facility upon discovering an incident of threatened suicide, unfounded hostage situation, or the presence of abnormal mental or psychologic behavior.*"

19

93.    In failing to train and supervise Officer Ragland, CMHA and CMHA PD disregarded known and foreseeably obvious consequences of their actions', as did Officer Ragland. The consequence were the constitutional violations and the injuries and death to Maalik.

94.    A similar pattern of violations within CMHA and the CMHA PD by untrained police officers has historically existed within CMHA and/or the CMHA PD. This is in part due to an official policy, practice, procedures and custom to shorten the Field Training with respect to de-escalation techniques, improper training in crisis intervention and in managing CMHA residents and individuals in a mental crisis.

95.    Those individuals from CMHA and CMHA PD who were involved in failing to train and failing in their supervise roles for CMHA PD are Chief González, Deputy Chief McDowell, Police Commander Burdyshaw, Police FTO Officer Smiddy, CEO Patterson and John Does I-X.

96.    These Defendants were personally involved in the deprivation of Maalik's constitutional rights because each condoned, encouraged and/or knowingly acquiesced in the decision to fail to train and supervise Officer Ragland. Their actions constitute more than mere awareness of incomplete training and supervision of Officer Ragland. Their actions constitute a final coordinated policymaking effort as demonstrated by the Field Commander Evaluation of Officer Ragland #57 memorandum.

97.    This document was created in the ordinary course of business by CMHA PD staff. Chief González, Deputy Chief McDowell, Police Commander Burdyshaw, Police FTO Smiddy, CEO Patterson and John Does I-X had actual or constructive notice that the policy and custom of creating an abbreviated and incomplete officer Field Training program would cause CMHA PD officers (including Officer Ragland) to remain deliberately indifferent when working alone

(without guidance and supervision) and. Remain  inadequately trained in the safe management of an individual exhibiting abnormal mental or psychologic behavior and mental health crisis and that this failure to train and to supervise would cause officers to violate an individual's constitutional rights.

98.    Had the full field training program been completed, by Officer Ragland and his supervisors together, Officer Ragland would not have been working alone and untrained. Officer Ragland would have had the benefit of an additional trained Field Training Officer when encountering Maalik and Maalik would not be the victim of Officer Ragland's deliberate indifference.

99.    Defendants abbreviated training to prematurely place Officer Ragland in active service as a one-man unit in part, was due to a police staffing shortage for the Night Shift, D-Platoon.

## CMHA COMMUNITY POLICIES

100.   The CMHA policies referred to herein include but are not limited to those policies which were in place on September 5, 2022, to meet CMHA's 2018-2023 written *Strategic Plan* goals. The *Strategic Plan* and policies applied to Maalik as a CMHA resident.

101.   The CMHA policies were in place to meet the written goals and promises of the *CMHA Strategic Plan* and include but are not limited to policies that:

- Strengthen programming and opportunities to achieve empowerment and self-sufficiency for youth and adult residents of CMHA.
- Enhance resident safety, well-being, and independence through partnerships for employment, job training, education, health and other evidence-based supportive services.
- Provide quality customer service (police) consistent with Mission and Core Values.
- Invest in employees and strengthen track record for integrity, accountability and collaboration.
- Conduct CMHA business in an open and transparent manner that promotes

21

accountability, responsibility, diversity and adherence to the highest ethical standards.
- Engage and collaborate with community stakeholders and partners to achieve the overall mission of the Authority.
- Lead, encourage and build partnerships with local, regional and national organizations to promote policies that build community; increase and enhance affordable housing options; and provide programs that reflect and support the needs of our communities and the customers we serve.
- Value community knowledge, needs and experiences by listening, learning and researching; and respond to issues compassionately, intelligently and intentionally.

102.    The policies and procedures in place for CMHA to meet these goals were inadequate.

103.    CMHA considers the CMHA PD a joint working obligor in the implementation of its *Strategic Plan*.

104.    The inadequate CMHA policies, procedures and programs on September 5, 2022, that were in place to meet these written CMHA identified goals are unfortunately, foreseeably consistent with the tragic events leading to the death of Maalik.

105.    The inadequate CMHA policies and procedures are deliberately indifferent to the civil rights and constitutional rights of CMHA residents, including Maalik.

106.    The inadequate policies of CMHA were a proximate cause of Maalik's death as they failed to address CITT and FTO training.

107.    The inadequate CMHA policies were a moving force behind the constitutional violation.

108.    The CMHA policies and procedures are inadequate because they fail to adequately address the community training need for officers to be adequately educated in crisis intervention and the forty (40) hour CITT course and they are inadequate because they fail to require complete Field Training with a certified Field Training Officer.  Additionally, CMHA and CMHA PD training policies, procedures and programs are inadequate and/or non-existent with respect to Title

II of the ADA.

109.    Each goal in the CMHA *Strategic Plan* represents a combination of policy, procedure, custom, and community practice, that are and remain inadequate.

## HARM TO PLAINTIFF

110.    Family members, including Maalik's mother Ms. Roquemore, lost the consortium, love, society, and affection of Maalik due to the Defendants' actions.

111.    As a direct and proximate result of the conduct of the Defendants, Maalik suffered pre-death agony, physical and mental injury, pain and suffering, emotional and psychological trauma, and eventually died because of the use of force, Defendants' actions and constitutional violations.

112.    As a further direct and proximate result of Maalik's wrongful death, Ms. Roquemore, survivors, next of kin, and/or heirs have suffered permanent damages, including, but not limited to, grief, depression, PTSD, and severe emotional distress. They have incurred funeral bills and other expenses and will incur additional expenses in the future.

## FIRST CAUSE OF ACTION
*Excessive Force (And Failure to Train and Supervise 42 U.S.C. § 1983)*

113.    Plaintiff adopts and incorporates herein by reference all claims, counts, allegations explanations and averments contained in this Complaint, whether stated before or after this claim or count, as if same were fully rewritten herein.

114.    Defendants Officer Ragland, CMHA, CMHA PD, Chief González, Deputy Chief McDowell, Police Commander Burdyshaw, Police FTO Officer Smiddy, CEO Patterson and John Does I-X have, under color of law, deprived Maalik Roquemore of rights, privileges, and immunities secured to him by the United States Constitution, including the prohibition on unreasonable searches and seizures contained in the Fourth and Fourteenth Amendments to the

United States Constitution.

115.   Officer Ragland, with deliberate indifference, used unreasonable and excessive force when initially and thereafter encountering Maalik who was *unarmed* and posing no serious or direct threat to the health or safety of Officer Ragland or others. Maalik was unreasonably shot twice, unreasonably handcuffed and unreasonably physically forced to move by Officer Ragland after the shooting. Officer Ragland used unreasonable and excessive force including but not limited to, unreasonably firing his handgun and unreasonably handcuffing Maalik. Officer Ragland further deliberately and unreasonably exercised his physical dominance over the dying Maalik by physically forcing Maalik to move into the street.  Forcing the dying Maalik to physically move to the street, after he was seized and shot, was deliberately indifferent as well as cruel and unusual punishment and violated the constitution's Eighth Amendment. Officer Ragland's actions constitute at least three different uses of objectively unreasonable, unnecessary, gratuitous, excessive and unconstitutional uses of force. It is clearly established that such excessive actions and misconduct by Officer Ragland are unconstitutional within the context of the events surrounding this fatal police shooting.

116.   Officer Ragland was deliberately indifferent to Maalik when he initially and thereafter encountered Maalik and when he used unreasonable force against Maalik.

117.   Chief González, Deputy Chief McDowell, Police Commander Burdyshaw, Police FTO Officer Smiddy, CEO Patterson and John Does I-X as training policymakers, at the direction of CMHA and the CMHA PD acted deliberately indifferent when each deliberately and unreasonably intervened, promoted, ratified and acquiesced in Officer Ragland's abbreviated training process.  This intervention and ratification significantly shortened Officer Ragland's Field Training and caused a significant deficiency in Officer Ragland's field understanding and

knowledge when interacting with Maalik.  The inadequate training, indifference and ratification was one proximate cause and nexus to Ragland's excessive use of force and Maalik's unnecessary death.

118.   CMHA, CMHA PD and public institutions John Does I-X acting under color of law, deliberately failed to provide an adequate procedure and policy applicable to first year officers such as Officer Ragland that would guide CMHA PD officers when encountering CMHA residents with mental illness or abnormal mental or psychological behavior, such as displayed by Maalik on September 5, 2022.

119.   CMHA, and CMHA PD, and John Does I-X also failed to provide Ragland and officers an adequate policy and procedure for first year officers operating alone, regarding use of force, de-escalating and the managing the mentally ill person. Nor did they provide Ragland and officers a meaningful CITT and field training policy, procedure, and program to guide officers who encounter unarmed mentally ill citizens such as Maalik.

120.   CMHA, CMHA PD and John Does I-X failed to adequately train and supervise officers and Ragland as identified herein in this First Amended Complaint.

121.   CMHA, CMHA PD and John Does I-X failure to train, supervise, and implement constitutionally appropriate customs, procedures, training practices and associated policies was deliberately indifferent to the rights of all citizens with or without mental illness, disabilities, and abnormal mental or psychological behavior, such as Maalik.

122.   The failure to train and supervise officers regarding the interaction with people and those with disabilities and in a mental health crisis was deliberately indifferent to the rights of individual residents likely to be encountered and seized.

123.   The rules, regulations, customs, policies, practices, usages, procedures, ratification,

inadequate training and supervision pursued by the Defendants were all unreasonable and were the moving force behind the constitutional deprivation suffered by Maalik.

**SECOND CAUSE OF ACTION**
*Wrongful Death*

124.   Plaintiff adopts and incorporates herein by reference all claims, counts, allegations and averments contained in this Complaint, whether stated before or after this claim or count, as if same were fully rewritten herein.

125.   Defendants' actions caused the wrongful death of Maalik, resulting in damages recoverable under R.C. § 2125.02 and pre-death agony as well.

**THIRD CAUSE OF ACTION**
*Americans with Disabilities Act (42 U.S.C. §12101 et seq.)*

126.   Plaintiff adopts and incorporates herein by reference all claims, counts, allegations and averments contained in this Complaint, whether stated before or after this claim or count, as if same were fully rewritten herein.

127.   The rendering of police services via CMHA and CMHA PD constitutes a public service, program, or activity of CMHA and CMHA PD within the meaning of Title II of the ADA. Maalik was subjected to discrimination on September 5, 2022, by CMHA, the CMHA PD and its agent Ragland. Maalik had a medically documented and confirmed mental illness (known to CMHA), was an otherwise a qualified individual with a disability and he was being excluded from participation in, and being denied the benefits of, or being subjected to discrimination under CMHA, CMHA PD programs and the ADA. This was because of his symptomatic mental health disabilities that were exhibited by him on September 5, 2022, at the CMHA Riverside property. Officer Ragland, CMHA and the CMHA PD did not accommodate Maalik's mental health disabilities but instead, discriminatorily and deliberately unreasonably seized and arrested Maalik

26

in a manner that deliberately did not reasonably accommodate his known and obvious mental disabilities.

128. Defendants deliberately, indifferently and intentionally discriminated against Maalik and failed to provide him a reasonable and safe accommodation when they used unnecessary and excessive force against him because of his disability, each time in violation of Title II of the Americans with Disabilities Act.

129. The reasonable accommodations provision of Title II of the Americans with Disabilities Act applies to the common areas of CMHA residential properties where Maalik encountered Officer Ragland and was fatally abused, shot and killed. Further, CMHA, CMHA PD and the remaining Defendants are liable for Maalik's pain, suffering and death as a result of their purposeful and deliberately indifferent roles in the death of Maalik.

**FOURTH CAUSE OF ACTION**
*State Law Claim*

130. Plaintiff adopts and incorporates herein by reference all claims, counts, allegations and averments contained in this Complaint, whether stated before or after this claim or count, as if same were fully rewritten herein.

131. CMHA and CMHA PD owed a duty of reasonable care to Maalik.

132. CMHA, CMHA PD, and their employees owed a duty to Maalik to develop and implement effective safety and training policies, customs, practices and procedures and to be in compliance with Title II of the ADA.

133. CMHA, CMHA PD and their employees identified herein breached the Strategic Plan, duty to provide crisis intervention training, CITT and FTO training, Title II of the ADA and their reasonable duty of care.

134. Maalik's death was caused by acts and omissions of CMHA, CMHA PD and the

employees identified herein during the course of their governmental or proprietary function.

135. Each Defendant acted not only negligently but also with malicious purpose, in bad faith, and/or in a wanton or reckless manner.

136. As a direct and proximate result of the breach of this duty, Maalik was killed by Officer Ragland and his family suffered as well, all as identified herein.

## PRAYER FO RELIEF

**WHEREFORE**, Plaintiff demand judgment as follows:

A. Compensatory damages against the Defendants in an amount to be shown at trial.
B. Punitive damages against the individual Defendants Officer Ragland, CMHA, CMHA PD, Deputy Chief McDowell, Police Commander Burdyshaw, Police FTO Smiddy, CEO Patterson in an amount to be shown at trial.
C. Costs incurred in this action and reasonable attorney fees under 42 U.S.C. § 1988.
D. Prejudgment interest.
E. A positive change in the CMHA Police training program that will ensure fully trained officers are placed on CMHA property and streets.
F. A positive change in CMHA policies and procedures underlying the Strategic Plan and in the operation of the CMHA PD including but not limited to ADA Title II training.
G. A publicly displayed plaque to be affixed in CMHA's main headquarters and police headquarters, memorializing Maalik Roquemore and the importance of mental health education for every police officer patrolling every CMHA community.
H. Such other and further relief as this Court may deem equitable and just.

## JURY DEMAND

Plaintiff requests a jury trial on all claims triable to a jury.

Respectfully submitted,
/s/ *David B. Malik*
David B. Malik (23763)
Attorney at Law
31320 Solon Road, Unit #19
Solon, Ohio 44139
P: 216.570.3898
E: david@davidmaliklaw.com
*Attorney for Plaintiff*

28

## CERTIFICATE OF SERVICE

A copy of the foregoing *First Amended Complaint* has been sent by USPS regular mail on this 24th day of September 2024 to:

| | |
|---|---|
| **Cuyahoga Metropolitan Housing Authority**<br>8120 Kinsman Road<br>Cleveland, OH 44104<br>*Defendant* | **Cuyahoga Metropolitan Housing Authority Police Department**<br>5715 Woodland Avenue<br>Cleveland, Ohio 44104<br>*Defendant* |
| **Andrés González, Chief, Cuyahoga Metropolitan Housing Authority Police Department**<br>5715 Woodland Avenue<br>Cleveland, Ohio 44104<br>*Defendant* | **Victor McDowell, Deputy Chief of Police, Cuyahoga Metropolitan Housing Authority Police Department**<br>5715 Woodland Avenue<br>Cleveland, Ohio 44104<br>*Defendant* |
| **Desmond Ragland c/o Cuyahoga Metropolitan Housing Authority Police Department**<br>5715 Woodland Avenue<br>Cleveland, Ohio 44104<br>*Defendant* | **Thomas Burdyshaw, Commander of Field Operations, Cuyahoga Metropolitan Housing Authority Police Department**<br>5715 Woodland Avenue<br>Cleveland, Ohio 44104<br>*Defendant* |
| **John Smiddy, Field Training Officer Program Supervisor, Cuyahoga Metropolitan Housing Authority Police Department**<br>c/o: Lorain County Metro Parks<br>12882 Diagonal Road<br>LaGrange, Ohio 44050<br>*Defendant* | **Jeffery Patterson,**<br>**Chief Executive Officer and Safety Director,**<br>**Cuyahoga Metropolitan Housing Authority**<br>8120 Kinsman Road<br>Cleveland, Ohio 44104<br>*Defendant* |